UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

| | | |
|---|---|---|
| MARIE E. SPINNEY, | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | Civ. No. 07-154-B-W |
| | ) | |
| LANE CONSTRUCTION CORP., | ) | |
| | ) | |
| Defendant | ) | |

AMENDED[1] RECOMMENDED DECISION
ON MOTION FOR SUMMARY JUDGMENT

Marie Spinney filed this action, removed from state court, pressing five state-law counts,

articulating legal claims arising from her termination as an employee of Lane Construction

Corporation.  The tale that wags the dog in this action is Spinney's contention that she was fired

from her job because four days prior to her termination she complained that she was being

treated differently from her male cohorts by the foreman of her crew after she refused his sexual

advances.   The case was removed to this court on grounds of diversity jurisdiction.   Lane

Construction Corporation has filed a motion for summary judgment (Docket No. 14).

In her amended complaint Spinney pled the following counts: Discrimination retaliation

in violation of the Maine Human Rights Act; violation of the Maine Whistleblower Protection

Act; breach of contract; a right to unpaid wages under 26 M.R.S. § 626; and tortious interference

---

[1]  This amendment merely corrects a typographical error on pages 1, 2 and 23.  The word "tortuous" is corrected to
"tortious".

with contractual advantage.[2]  In addition to moving for judgment on each of these counts, the

defendant seeks judgment against Spinney with regards to her assertion that she is entitled to

punitive damages.

In her memorandum responding to the motion for summary judgment Spinney consents

to dismissal of her tortious interference with contractual advantage count[3] and I recommend that

---

[2]      The parties have filed a stipulation that Spinney is not stating a claim for hostile working environment sexual harassment although Spinney reserved the right to present harassment evidence to the extent necessary to support her retaliatory discharge and whistleblower claims.  (Docket No. 13.)

[3]      (Mem. Opp'n Summ. J. at 4, 12; see also Reply Mem. at 1.) The facts material to that count are as follows: According to the defendant, shortly after Spinney's termination Sharron Edwards, a quality control technician for Lane, informed Raymond that Edwards had recently overheard two employees of the Maine State Department of Transportation telling Spinney ways she could "get back at" Dow by working for the State as an inspector and doing things to cause problems on Lane projects on which Dow worked as the foreman.  (SMF ¶ 19; Edwards Decl. ¶¶ 2-3; Raymond Decl. ¶ 4; Dow Dep. 9: 14-19.) Raymond passed this information on to Leach, who was then the district manager for Lane in Maine. (SMF ¶ 20; Raymond Decl. ¶ 4.)

Spinney denies Paragraphs 19 and 20 by citing to the following two paragraphs of her affidavit.  (Resp. SMF ¶¶ 19,20.)  She asserts that on or about September 13, 2005, she spoke with two state employees, John Ketchum and Joe Graham, about Mr. Dow's conduct toward her. Mr. Ketchum and Mr. Graham discussed with Spinney that she could obtain employment with an entity other than Lane and be free from such harassing behavior. They told her that someone who worked for the state or a subcontractor supervising road projects would not be subject to that kind of abuse and in fact would have the ability to correct Lane employees as part of their job functions.  (Spinney Aff. ¶ 14.) She did not have any conversation with Mr. Ketchum or Mr. Graham, or any other state employees, about ways to get back at Eugene Dow or Lane Construction.  Spinney never discussed with any state employee ways to cause problems for Lane on any Lane projects, by working as a state inspector or otherwise. (Id. ¶ 15.)

The parties do not dispute the following.  In September 2005, Janice Piper was a project manager employed by the Maine State Department of Transportation (MDOT).  (SMF ¶ 21; Resp. SMF ¶ 21.)  When MDOT had insufficient personnel to handle its quality assurance testing needs on State-funded paving projects, MDOT would call and make arrangements with a company like Construction Materials Testing (CMT) to provide additional personnel to do paving inspections for the State. (SMF ¶ 22; Resp. SMF ¶ 22.)  MDOT was shorthanded in September 2005, so Piper called the owner of CMT, Arnie Fessenden, to see if he had someone available to help. (SMF ¶ 23; Resp. SMF ¶ 23.)  Fessenden said he had someone available.  (SMF ¶ 24; Resp. SMF ¶ 24.)  The person available was Spinney, who had immediately applied for a job with CMT as a paving inspector after being fired by Lane. (SMF ¶ 25; Resp. SMF ¶ 25.)  Spinney went to work for CMT on a Lane project in Stetson. (SMF ¶ 26; Resp. SMF ¶ 26.)  Spinney's supervisor was a MDOT resident engineer assigned to oversee all of the inspectors on the project. (SMF ¶ 27; Resp. SMF ¶ 27.)  Spinney acted as the resident engineer's assistant, testing the mat and keeping a logbook of loads, mix, and where it was being placed. (SMF ¶ 28; Resp. SMF ¶ 28.)

The defendant maintains that, as an assistant to the State's resident engineer on the Lane project, Spinney had the power to temporarily shut down work on the project, costing Lane a significant amount of money. (SMF ¶ 29; Piper Dep. 16: 13-24; id.17: 5-12.)  Spinney responds that this is a hearsay assertion and that Spinney would not have the capacity to shut down Lane's work on her own initiative but that that decision would have been the resident engineer's upon consideration of Spinney's report of a potential problem.  (Resp. SMF ¶ 29; Piper Dep. 16-17.) Piper's testimony included an indication that Spinney would not have the capacity to shut down Lane on her own decision. (Piper Dep. 17:3-5.)  He explained:

that count be dismissed with prejudice.  As for the remainder of Spinney's action,   I recommend

the Court grant the motion for summary judgment on Spinney's unpaid wages claim and deny the

motion for summary judgment on the retaliation claims, the breach of contract claim, and on the

issue of punitive damages for the reasons below.

## DISCUSSION

A party moving for summary judgment is entitled to judgment in its favor only "if the

pleadings, depositions, answers to interrogatories, and admissions on file, together with the

affidavits, if any, show that there is no genuine issue as to any material fact and that the moving

party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  A fact is material if its

resolution would "affect the outcome of the suit under the governing law," and the dispute is

genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving

party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  In reviewing the record for

a genuine issue of material fact, the Court must view the summary judgment facts in the light

most favorable to the nonmoving party and credit all favorable inferences that might reasonably

---

But if she went to the resident and said, you know, we think there's a problem, then typically the resident would stop the work until a determination could be made regarding whether there really was a problem or not.
    So in effect, although she wouldn't have the control to continue that shutdown, she would have some potential for being able to have the project shut down for, you know, some short period of time.

(id. 17: 5-12.)
    There is no dispute between the parties as to the following.  When Leach discovered Spinney was inspecting Lane's work for the State, he telephoned Piper indicating that Spinney had just left Lane on poor terms, Spinney may not be able to deal fairly with Lane, and he thought it was a conflict of interest for her to be inspecting Lane's work. (SMF ¶ 30; Resp. SMF ¶ 30.)  Leach asked Piper to consider removing Spinney from Lane projects. (SMF ¶ 31; Resp. SMF ¶ 31.)  Piper thought that Leach's request was fair and reasonable, and she decided that Spinney would have to be removed from the Lane project. (SMF ¶ 32; Resp. SMF ¶ 32.)  Piper did not feel as though Leach was putting any inappropriate pressure on her in any way.  (SMF ¶ 33; Resp. SMF ¶ 33.)  Piper telephoned Fessenden and told him that the State could not use Spinney on Lane projects.  (SMF ¶ 34; Resp. SMF ¶ 34.)  CMT transferred Spinney off the Lane project to one in Jackman. (SMF ¶ 35; Resp. SMF ¶ 35.)  The project in Jackman finished and within only a couple weeks of being hired by CMT, Spinney was laid off for lack of work. (SMF ¶ 36; Resp. SMF ¶ 36.)

3

be drawn from the facts without resort to speculation.  Merch. Ins. Co. v. U. S. Fid. & Guar. Co.,

143 F.3d 5, 7 (1st Cir. 1998).  If such facts and inferences could support a favorable verdict for

the nonmoving party, then there is a trial-worthy controversy and summary judgment must be

denied.  ATC Realty, LLC v. Town of Kingston, 303 F.3d 91, 94 (1st Cir. 2002).

### *Factual Record*

Marie Spinney worked for Lane Construction Corporation (Lane) and on September 16,

2005, she was notified that her employment was to be terminated. (SMF ¶ 18; Resp. SMF ¶ 18.)[4]

Spinney began work with Lane as an equipment operator.  (SMF ¶ 1; Resp. SMF ¶ 1.)  In the fall

of 2004, Spinney met with Scott Leach who was then an assistant district manager for Lane.

(SMF ¶ 2; Resp. SMF ¶ 2.)  Leach told Spinney that she was going to be hired as a salaried

quality control technician starting in February of 2005 for 44 weeks on a salary of $650 per

week. (SMF ¶ 3; Resp. SMF ¶ 3; SAMF ¶ 50; Resp. SAMF ¶ 50.)  Leach told Spinney that she

would begin in February and be done some time in December. (SMF ¶ 4; Resp. SMF ¶ 4.)

According to Lane, Spinney began work in the 2005 season as a quality control technician.

(SMF¶ 5; Spinney Dep. 36: 14-25; Raymond Dep. 9: 13-16.)  According to Spinney, she began

working quality control in 2002 and was promoted from hourly to salaried in 2005.  (Resp. SMF

¶ 5; Spinney Dep. 15-16; Spinney Aff. ¶¶ 2, 6; SAMF ¶ 50; Resp. SAMF ¶ 50.)  Spinney says

she was a 44-week employee, which meant she would work 44 weeks at salary, and would get

paid for 44 weeks whether there was enough work available for her to do or not. (SAMF ¶ 51;

Raymond Dep. 37-39.)  Lane points out that Raymond testified that if the quality control

---

[4]      The parties have stipulated that Lane Construction Corporation employed more the 501 employees each of
20 or more calendar weeks in both 2004 and 2005.  (See Docket No. 21.)

inspector could no longer do inspections (to fill the 44-week work hours) then they would do odds and ends.  (Resp. SAMF ¶ 51; Raymond Dep. 37:11-13.)

In her job as quality control inspector, Spinney worked at job sites throughout eastern Maine, wherever her supervisors situated at an Orono, Maine location directed her to go. (SAMF ¶ 52; Resp. SAMF ¶ 52.) One of the job sites at which Spinney worked was with the Medway, Maine crew, wherever it was stationed. (SAMF ¶ 53; Resp. SAMF ¶ 53.)  According to Spinney, the general foreman for the Medway crew, Eugene Dow, sexually harassed Spinney, touched her in an offensive way, and propositioned her in 2004. (SAMF ¶ 53; Spinney Aff. 8.) Lane does not contest Spinney's assertion that Dow asked Spinney to have sex with him and began treating her harshly when she refused, although Lane does note that this request for sex was made more than a year before Spinney's termination.  (SMF ¶ 37; Resp. SMF ¶ 37.) According to Spinney, the sexual harassment of Spinney by Dow included comments such as a claim that she had breast implants and, on one occasion in late August or early September of 2004, included groping by Dow and a sexual proposition that Spinney sleep with him. Spinney refused that request and tried to avoid Dow thereafter, unless absolutely necessary. (SAMF ¶ 54; Spinney Aff. ¶ 8.)  Lane denies this description of Dow's behavior, pointing to Dow's denials of this conduct.  (Resp. SAMF ¶¶  53, 54; Dow Dep. 33-34, 42.)   Lane recognizes that this dispute must be resolved in Spinney's favor for the purposes of this summary judgment motion.

During the 2005 calendar year, Spinney was sexually harassed by a paving foreman with the Orono crew, Jake Austin.  Austin would try to grab Spinney by the crotch, try to pinch her breasts, or ask her to display her breasts to him.  (SAMF ¶ 55; Spinney Aff. ¶ 9.)  Lanes qualifies this paragraph by citing to a portion of Spinney's deposition testimony that limited Austin's conduct to always asking Spinney to show her tits and coming up behind her, grabbing her,

humping her, and then laughing.  (Resp. SAMF ¶ 55; Spinney Dep. 21: 13-22:3.)  Spinney

maintains that she complained of Austin's behavior (including specifically the fact that Austin

sometimes grabbed her and tried to hump on her leg) to her supervisor, Ed Nason, on two

occasions.  (SAMF ¶ 56; Spinney Dep.18, 23.)  Spinney asserts that Nason simply responded

that Spinney didn't have to worry about Jake, he was a good old boy.  (SAMF ¶ 57; Spinney

Dep.18.) Spinney relates that she showed Nason and others a photograph of Austin displaying

his genitalia through his clothing, and said that's how Jake acts around her, and Nason and the

others laughed. (SAMF ¶ 58; Spinney Dep. at 24-25.)

       Lane responds that Nason professes that he does not remember any complaint to him in

2005 by Spinney about Austin.  (Resp. SAMF ¶ 56; Nason Dep. 15: 25-16: 2.)  Nor does Nason

remember telling Spinney that Austin was a good old boy or having Spinney show him a

photograph of Austin displaying his genitalia.  (Resp. SAMF ¶¶ 57, 58; Nason Dep. 17:10-15.)

       On Monday, September 12, 2005, Spinney was standing off the road, outside the

construction site (in the yard by the State trailer), not wearing her hardhat, when Dow drove up

and got out screaming at her for not wearing a hardhat.  (SMF ¶ 38; Resp. SMF ¶ 38; Spinney

Dep. 17:16-20; Singer Decl.  ¶ 2.2; SAMF ¶ 59.) Spinney told Dow she did not need to wear a

hardhat where she was standing. (SMF ¶ 39; Resp. SMF ¶ 39.) Dow insisted she did have to

wear it, to which Spinney responded, "Whatever—I'll get it." (SMF ¶ 40; Resp. SMF ¶ 40.) As

Spinney headed back to her truck to get her hardhat, Dow chased her and kept hollering at her.

(SMF ¶ 41; Resp. SMF ¶ 41.)  A male employee was also standing there without a hardhat and

the male employee put on his hardhat after Dow yelled at her. (SMF ¶ 42; Resp. SMF ¶ 42.)

According to Spinney she pointed out to Dow that two male state employees and a male Lane

employee were there and also were not wearing hard hats. Dow said nothing to those male

6

employees, but chased Spinney to her truck yelling at her.  (SAMF ¶ 59; Spinney Aff. ¶ 11.)
Lane responds that Dow told both Spinney and Chris Federico (the other Lane, as opposed to
State, employee) to put their hardhats on.  (Resp. SAMF ¶ 59; Dow Dep. 16: 13 -17:15.)

Spinney relates that she complained of Dow's conduct to Nason and told Nason that she
was being treated differently than male employees. Spinney asked Nason if she still had to work
with Dow, and he told her that she had no choice but to work with Dow whenever she was sent
to his job site. (SAMF ¶ 60; Spinney Aff. 12.) Lane's only qualification of this description is that
Spinney told Nason that he was treating her different than "a male employee, Chris Federico."
(Resp. SAMF ¶ 60; Nason Dep. 22: 10-16.)

Shortly thereafter, Spinney was at the Lane lab in Bangor, in tears, where she told
Raymond what happened with Dow, and that the only reason why Dow treats her like that is she
refused to sleep with him. (SMF ¶ 43; Resp. SMF ¶ 43; Spinney Dep. 20: 11-19.)[5]  Spinney
maintains that she told Raymond that she felt that she had been physically threatened by Dow,
that she was treated differently than a male employee, and that this treatment had begun and
gotten worse ever since she had refused to sleep with Dow.  (SAMF ¶ 61; Spinney Aff. ¶ 13.)
She reports that Raymond simply responded that Spinney should wear her hardhat from now on.
(SAMF ¶ 62; Spinney Dep. 20:20-22; SMF ¶ 58; Raymond Dep. 58: 14- 16; id. 59: 3-6.)  (Resp.
SAMF ¶ 62; Raymond Dep. at 58:17-59:6.)  Spinney stresses that this directive followed not
only her description of the hardhat incident but also her report that Dow's treatment of her was a

---

[5]      The defendant notes that Dow flatly denies the description of his conduct, and also denies Spinney's
version of a "hardhat incident."  (Dow Dep.16-17, 25-26, 33-34, 42.) Lane therefore states this as a fact only for
purposes of its motion for summary judgment, since in reviewing its motion for summary judgment, the Court is
required to credit Spinney's version of events. The defendant further notes that Raymond denies Spinney said
anything to him about Dow treating her harshly because she would not sleep with him. (Raymond Dep.59: 3-6.)
Again, however, it recognizes that in reviewing Lane's motion for summary judgment, the Court must credit
Spinney's version of the conversation.

consequence of her refusal to sleep with him.  (Resp. SMF ¶ 48; Spinney Dep. 20: 16-22.)   Lane notes that Raymond testified that Spinney never told him that Dow treated her poorly ever since, or because, she had refused to sleep with him, although he does concede that he told her just to wear her hardhat.  (Resp. SAMF ¶ 62; SMF ¶ 49; Raymond Dep. 58: 14- 16; id.59: 3-6; Spinney Dep. 20: 20-22.)

Spinney alleges that her co-worker Bruce Rideout heard her complaint about Dow treating her harshly because she would not sleep with him, and that two other co-workers, Jason Barron and Josh Shaw might have also heard her complaint. (SMF ¶ 44; Spinney Dep. 20;11-15.)  According to Lane, Rideout did not hear Spinney complain about Dow treating her badly because she would not sleep with him.  (SMF ¶ 45; Rideout Decl. [¶3.])  Spinney correctly points out as a qualification of this statement that she directly told Raymond and Rideout this information.  (Resp. SMF ¶¶ 44, 45; Spinney Dep. 20: 16-17.)   There is no dispute that Barron did not hear Spinney complain about Dow treating her badly because she would not sleep with him.  (SMF ¶ 46; Resp. SMF ¶ 46.) Neither did Shaw hear Spinney complain about Dow treating her badly because she would not sleep with him. (SMF ¶ 47; Resp. SMF ¶ 47.)

During the 2005 season, Brian Raymond was Lane's quality control manager for the Bangor area.   (SMF ¶ 6; Resp. SMF ¶ 6.)  Raymond's duties as the quality control manager included evaluating the job performances of quality control technicians.  (SMF ¶ 7; Raymond Dep. 9: 21-22; 15; 6- 8; 16: 20; 21:8-12; 44: 22-25; 45: 10-11.)[6]

According to Lane, in July of 2005, Spinney was having significant difficulties using a soil gauge when no other quality control technician had difficulties using that equipment. (SMF

---

[6]      Spinney denies this statement asserting that it is unsupported by the record references.  I disagree, in that if you cobble the deposition testimony together it does support the proposition that Raymond had this evaluative duty.

¶ 8; Raymond Dep. 16: 7-12; Raymond Decl. ¶ [3][7])(emphasis added).   Spinney counters that at his deposition Raymond did not use the characterization "significant" but stated that on one occasion Spinney "wasn't having very good luck using the gauge" and indicated that another technician was also having difficulties with the soil gauge, although to a lesser degree.  (Resp. SMF ¶ 8; Raymond Dep. at 15-16.)   On this score, in his deposition testimony Raymond added when pressed on the performance of other technicians, "no, I haven't had other technicians have issues with the soil gauge."  (Raymond Dep. 16.)   There is no dispute that when Raymond tried to work her through her difficulties, he became frustrated when Spinney would not listen to what he was saying and he had to repeat himself several times. (SMF ¶ 9; Raymond Dep. 16: 15-20; Resp. SMF ¶ 9.) Spinney adds that Raymond did not make a note in Spinney's personnel file about this incident.  (Resp. SMF ¶; Raymond Dep. 17: 9-11.)

Lane asserts that Spinney received two verbal warnings in 2005, one in July for not helping out in the lab when needed and one in August for misuse of a company vehicle.  (SMF ¶ 10; Raymond Dep. 54:19-24; id. 57:17-22;  id.44:22-25; Raymond Dep. Ex. 7.)  Spinney acknowledges that she received the verbal warning concerning the lab but denies that she received the verbal warning for misuse of a company vehicle.  (Resp. SMF ¶ 10.)  In support of this denial she argues that Raymond's representation on this score is hearsay and points to his testimony that he could not recall whether or not Spinney was warned for the misuse of a company vehicle.  (Resp. SMF ¶ 10; Raymond Dep. 57.)[8]  She adds that neither of these alleged verbal warnings made it into her personnel file.  (Resp. SMF ¶ 10; Raymond Dep. 46.)

---

[7]       The defendant actually cites to Paragraph 2 of the Raymond Declaration but the characterization of Spinney's difficulties as significant appears in Paragraph 3.

[8]       Exhibit 7 to the Raymond Deposition on which the defendant relies is a memorandum by Raymond dated November 30, 2005, -- well after Spinney's termination -- which represents that, among other warnings to Spinney and others, Raymond did give a verbal warning to Spinney in August 2005 about the correct use of a company

There is no dispute that in September of 2005, Raymond prepared a document titled "Quality Control Technician Review," in which he rated the job performance of Lane's quality control (QC) technicians in Maine according to the categories of attendance, capability, attitude, improvement, and leadership.  (SMF ¶ 11; Resp. SMF ¶ 11.) Raymond completed the spreadsheet by September 8, 2005, (it is dated September 7, 2005) to assist him in making recommendations for merit raises. (SMF ¶ 12; Resp. SMF ¶ 12.) Spinney received the lowest job rating of any of the 14 quality control technicians.  (SMF ¶ 13; Resp. SMF ¶ 13.)

According to Lane, during the 2005 season, Joe Rollins was a plant manager who, together with Raymond, had supervisory authority over Spinney. (SMF ¶ 14; Raymond Dep. 60: 9-10; id. 9: 21-25; id. 10:9-19.)  As Spinney asserts, Raymond testified that he was never Spinney's direct supervisor but that Spinney's direct supervisor was Joe Rollins or Ed Nason. (Resp. SMF ¶ 14; Raymond Dep. 10: 3-12.)  Raymond did indicate that he played a role in her job assignments and played a role in the decision to fire her.  (Raymond Dep. 9: 19-22; id. 10: 13-19.)

According to Lane, after reviewing the job performances of the quality control technicians, Raymond met with Rollins and discussed the future of the quality control department and a desire to improve the quality of the department.  (SMF ¶ 15; Raymond Dep. 60: 22-25.)  Raymond and Rollins also discussed the quality of Spinney's work and whether she was fulfilling the expectations of her employer. (SMF ¶ 16; Raymond Dep. 60:22 – 61:3.) Raymond and Rollins found that Spinney was not meeting Lane's expectations and decided to terminate her employment. (SMF ¶ 17; Raymond Dep. 9:19-25; id. 49: 21 -24.)  As Spinney

---

vehicle.  It is odd that Spinney does not cite to her own deposition or affidavit to counter the defendant's assertion concerning this warning.

points out, judging by Raymond's own deposition testimony, this meeting seemed to be specifically about Spinney.  (Resp. SMF ¶ 15; Raymond Dep. 60:22-23, 25; id. 1-3.) There is no dispute that on Friday, September 16, 2005, Raymond and Rollins met with Spinney and informed her of their decision to terminate her employment. (SMF ¶ 18; Resp. SMF ¶ 18.)

Spinney advances the following facts in support of her claim that Lane's explanation for her termination is disingenuous.  There is no dispute that before Spinney was fired (i.e., sometime between September 12 and September 16), Dow discussed the hardhat incident with Ed Nason, Joe Rollins and Brian Raymond.  (SAMF ¶ 63; Resp. SAMF ¶ 63.)   According to Spinney, on September 16, 2005, Joe Rollins told Spinney that her employment was being terminated because her work wasn't up to par, and Brian Raymond spoke up and said "There's nothing wrong with Marie's work."  Rollins responded that it didn't matter, Spinney couldn't get along with the Medway crew, and Lane had no alternative but to terminate her. (SAMF ¶¶ 64, 65; Spinney Aff. ¶¶ 16-17.)  Lane responds by citing to Raymond's Deposition in which he indicates that he does not <u>remember</u> saying there was nothing wrong with Spinney's work at the meeting.  (Resp. SAMF ¶ 64; Raymond Dep. 63: 7-19.)  He also testified that he does not <u>remember</u> Rollins saying that Spinney was being fired because she couldn't get along with the Medway crew, nor did he <u>remember</u> Rollins saying Lane had no alternative but to terminate Spinney.  (Resp. SAMF ¶ 65; Raymond Dep. 63:20-64-7.)  There is no dispute that Lane had more quality control inspectors and a different person could have been assigned to work on the Medway job site.  (SAMF ¶ 66; Resp. SAMF ¶ 66.)

Raymond prepared the document entitled "Quality Control Technician Review - September 7, 2005" of his own volition, with the intent of using it to determine merit increases, not to use as the basis for terminating anyone's employment.  (SAMF ¶ 67; Resp. SAMF ¶ 67.)

11

When he was preparing this document Raymond never thought that Spinney would be terminated as a result of this "Quality Control Technician Review." (SAMF ¶ 68; Resp. SAMF ¶ 68; Raymond Dep. 33:21-24.) In considering each employees' capability, Raymond reviewed their certificates. (SAMF ¶ 69; Resp. SAMF ¶ 69.) Spinney had an NETTCP (New England Technician Transportation Certification Program) paving inspector certification and certification to operate nuclear gauges, which three other employees (Karl Haller, Charles Fuller and Paul Ryder) did not have; yet Raymond ranked those three employees as being equally or more capable than Spinney. (SAMF ¶ 70; Resp. SAMF ¶ 70.) Spinney took the NETTCP exam and scored 91 written, 97 practical. (SAMF ¶ 71; Resp. SAMF ¶ 71.) Raymond initially believed that Spinney did not have her plant technician certification whereas other QC inspectors did; however, after reviewing Exhibit 4, Raymond realized that Spinney did in fact have her plant technician certification. (SAMF ¶ 72; Resp. SAMF ¶ 72.) Raymond and Scott Leach both told Spinney that she had done a good job when she passed the plant certification exam with a score of 97. (SAMF ¶ 73; Resp. SAMF ¶ 73.)

According to Spinney, at the end of each year that Spinney worked as a quality control inspector, Ed Nason told her that she had been doing "a real good job" and that Lane was "real happy with you." Wendell Ellis, one of the foremen, and Mark Eddy, the hot top plant foreman, also told Spinney that she was doing a good job. (SAMF ¶ 74; Spinney Aff. ¶ 4.) Bruce Rideout, the second in command to Brian Raymond at the Hermon QC lab, told Spinney that she was doing a really good job, and called her his "ace in the hole." (SAMF ¶ 75; Spinney Aff. ¶ 5.) [9]

---

[9]     The defendant purportedly qualifies these two statements by observing that the affidavit statement does not give any indication as to when Ellis, Eddy, and Rideout may have made such statements. (Resp. SAMF ¶¶ 74, 75.) The affidavit does support the paragraphs as written and the statement stands in the record for what it is meant to demonstrate complete with the uncertainties of just when in time the statements were made.

According to Spinney, during the course of her employment as a quality control inspector with Lane, she was never disciplined or warned about the quality of her work; on the contrary, Spinney was told that she was doing a good job.  (SAMF ¶ 76; Spinney Aff. ¶ 18.)  Lane provides a conclusory: "Denied."  (Resp. SAMF ¶ 76.)  It offers a string cite to the following record evidence:  Raymond's testimony that Spinney was having trouble with the soil gauge that was "so basic," this was frustrating, and there was a conversation between the two about how to use it (Raymond Dep. 16:7-20; Raymond Decl. ¶ [3]); in July 2005 Spinney was warned about helping out in the lab when needed (Raymond Dep. 54: 19-24); in August 2005 Spinney was warned about correct use of the company vehicle (id. 57-17-22)[10]; and the November 30, 2005, memorandum in which Raymond indicates that he gave two verbal warnings to Spinney regarding the lab and company vehicle.  (Raymond Ex. 7; see also Raymond Dep. 44:22-25.)

### Maine Human Rights Act and Maine Whistleblower Protection Act Counts

The parties are in agreement that Spinney's Maine Human Rights Act (MHRA) retaliation claim and her Maine Whistleblower Protection Act (WPA) claims are analyzed under the same legal standard and, what is more, this is the equivalent to the legal standard for Title VII claims of unlawful retaliatory discharge.  (Mem. Mot. Summ. J. at 6; Mem. Opp'n Mot. Summ. J. at 5-6.)  See Currie v. Indus. Sec., Inc., 2007 ME 12, ¶ 13, 915 A.2d 400, 404 ("Our construction of the MHRA and WPA has been guided by federal law and we have previously "evaluate[d] WPA claims with the 'shifting burdens' analysis articulated in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973).") (citations omitted).

---

[10]     The defendant's  citation to lines stops short of Raymond's testimony that this did not play a role in her evaluation.  (Id. 57:23-58:1.)

It is unnecessary to explore the interstices of the first two inquiries of the <u>McDonnell</u> <u>Douglas Corp. v. Green</u>, 411 U.S. 792, 802 (1973) burden shifting framework applicable to claims of discrimination apropos which there is no direct evidence of discrimination.   <u>See</u> <u>Feliciano de la Cruz v. El Conquistador Resort and Country Club</u>, 218 F.3d 1, 5 -6 (1st Cir, 2000) (setting for the first two stages of the burden-shifting analysis).  There is no dispute that Spinney had established a <u>prima</u> <u>facia</u> case of retaliation by her evidence that four days before her termination she complained to Raymond that Dow had treated her unfairly and harshly for not wearing a hardhat because she had spurned his sexual advances.  (Mot. Summ. J. at 7; Mem. Opp'n Mot. Summ. J. at 5.)   There is also no dispute that Lane has articulated a legitimate non-discriminatory reason for Spinney's termination in advancing evidence that Spinney was terminated for her poor performance.  (Mem. Opp'n Mot. Summ. J. at 5.)

This takes us to Spinney's burden "to show that the reason proffered was 'a coverup' for a 'discriminatory decision.'" <u>Id.</u> at 6 (quoting <u>McDonnell Douglas</u>, 411 U.S. at 805).  "At this third step in the burden-shifting analysis, 'the <u>McDonnell Douglas</u> framework falls by the wayside,'" <u>id.</u> (quoting <u>Mesnick v. General Elec. Co.</u>, 950 F.2d 816, 824 (1st Cir.1991), "because the plaintiff's burden of producing evidence to rebut the employer's stated reason for its employment action 'merges with the ultimate burden of persuading the court that she has been the victim of intentional discrimination.'"  <u>Id.</u>  (quoting <u>Texas Dept. Cmty. Affairs v. Burdine</u>, 450 U.S. 248, 256 (1981)).

"It is the settled law of this circuit that to survive a motion for summary judgment on a Title VII disparate treatment claim, a plaintiff must produce evidence that:"

> (1) the employer's articulated reason for laying off the plaintiff is a pretext; and
> (2) the true reason is discriminatory animus. <u>See</u> <u>Thomas [v. Eastman Kodak</u>

14

Co.], 183 F.3d [38,] 56 [(1st Cir. 1999)]. This standard, however, "does not necessarily require the introduction of additional evidence beyond that required to show pretext." Id. at 57 (internal quotation marks and citations omitted). The same evidence used to show pretext can support a finding of discriminatory animus if it enables a factfinder "reasonably to infer that unlawful discrimination was a determinative factor in the adverse employment action." Id. (internal quotation marks and citations omitted). There is simply "no mechanical formula" for determining whether the plaintiff's evidence of pretext and discriminatory animus suffices to forestall summary judgment. See id.

In evaluating whether summary judgment was proper, therefore, we must weigh all the circumstantial evidence of discrimination, including the strength of the plaintiff's prima facie case and the employer's proffered reasons for its action, mindful that "everything depends on individual facts." Id.

Id. at 6-7.

Lane takes the position that Spinney is relying too much on improbable inferences and unsupported speculation in arguing that she meets her summary judgment burden vis-à-vis demonstrating pretext and discriminatory animus.  (Mem. Mot. Summ. J. at 11; Reply Mem. at 2, 4.)  See Feliciano de la Cruz, 218 F.3d  at 5; Medina-Munoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir.1990).

"In evaluating whether" Lane's stated reason for firing Spinney "was pretextual, the question is not whether [Spinney] was actually performing below expectations, but whether [Lane Construction] believed that she was." Feliciano de la Cruz, 218 F.3d at 5 (citing Mulero-Rodriguez v. Ponte, 98 F.3d 670, 674 (1st Cir. 1996) and Goldman v. First National Bank of Boston, 985 F.2d 1113, 1118 (1st Cir.1993)).  Lane argues that there is little or no evidence from which to infer that its "job performance issues with Spinney were a pretext." (Mem. Mot. Summ. J. at 9.)  It recites its evidence in support of its performance related non-discriminatory reason for the termination:  Spinney had difficulty with the soil testing equipment ("wasn't having very good luck using the gauge" ), she had two verbal warnings in 2005 (one of which is contested by Spinney); she was flippant with Dow when he told her to put on her hardhat when

15

she remarked "Whatever (adding "I'll get it"); and she had the lowest job performance rating of her QC peers in the memo prepared by Raymond to help determine merit raises.  (<u>Id.</u>)  It characterizes as "thin and disputed" Spinney's evidence of pretext, relegating the specifics to a footnote.  (<u>Id.</u> at 10 & n.3.)

The evidence of pretext advanced by Spinney is the following.  There is no dispute that before Spinney was fired Dow discussed the hardhat incident with Nason, Rollins, and Raymond.  With regards to the purpose of the meeting in which Rollins and Raymond decided to terminate Spinney, Spinney points out, that judging by Raymond's own deposition testimony, this meeting seemed to be specifically about Spinney and not a general review of employment prospects for the contingent of QC employees.  Raymond prepared the "Quality Control Technician Review" memo of his own volition, with the intent of using it to determine merit increases, not to use as the basis for terminating anyone's employment and at this juncture, over a week prior to Spinney's termination, he never thought that Spinney would be terminated as a result of this review.  Raymond knew Spinney had an NETTCP paving inspector certification and certification to operate nuclear gauges, which three other employees did not have.  On the NETTCP exam she scored 91 written, 97 practical. Spinney did in fact have her plant technician certification. Raymond and Scott Leach both told Spinney that she had done a good job when she passed the plant certification exam with a score of 97.

According to Spinney, at the end of each year that Spinney worked as a quality control inspector, Nason told her that she had been doing "a real good job" and that Lane was "real happy with you." Ellis, one of the foremen, and Eddy, the hot top plant foreman, also told Spinney that she was doing a good job. Rideout, the second in command to Raymond at the Hermon QC lab, told Spinney that she was doing a really good job, and called her his "ace in the

16

hole." According to Spinney, during the course of her employment as a quality control inspector with Lane, she was never disciplined or warned about the quality of her work; on the contrary, Spinney was told that she was doing a good job.   Lane has not refuted these comments.  Also, Spinney had just been promoted to a salaried position in early 2005.

 Spinney maintains that when Rollins told Spinney that her employment was being terminated because her work wasn't up to par Raymond spoke up and said "There's nothing wrong with Marie's work" and that Rollins responded that it didn't matter, Spinney couldn't get along with the Medway crew, and Lane had no alternative but to terminate her.   Lane's only negation of these representations is Raymond's  alleged inability to "remember" this exchange. There is no dispute that Lane had more quality control inspectors and a different person could have been assigned to work on the Medway job site.  There is also no evidence that there was a company need to cull the ranks of the QC employees.

Raymond did not make a note in Spinney's personnel file about her bad luck with the soil gauge.  Indeed, there is no evidence of any thought-through steps taken to formally track Spinney's alleged performance failures  -- the soil gauge, the lab duty, and the company vehicle issue --  with a mind to paving the way for any position determinative actions by Lane.  Lane argues that Raymond and Nason would not risk their professional careers by firing Spinney for improper reasons but a counter inference can be drawn that the supervisors would not risk their positions by not properly tracking, documenting, and warning Spinney prior to making a decision to terminate her.  The inference can be drawn that the decision to terminate Spinney was not made in the ordinary course of personnel management but was precipitated by the recent events.  I am not convinced that a trier-of-fact would conclude that Spinney's remark to Dow  -- "Whatever, I'll get it." – was even flippant in the context of this interaction, much less one that

17

would trigger a termination decision in the context of an employee that has had a couple of verbal warnings about non-safety issues and had a hard time with one of the basic devices such as a soil gauge when there is evidence that Spinney's certifications were above par.  Lane does not dispute that Dow had a markedly strong reaction to Spinney's failure to have her hardhat on, chasing her while hollering as she retrieved the hat.  This "whatever" comment is the only evidence cited by Lane that is the temporal hook for the termination decision as the September 7, 2008, memorandum was not meant to be part of an employment termination decision.

There is also evidence of the Austin and Dow harassment.  There is no dispute for summary judgment purposes that Dow asked Spinney to have sex with him and began treating her harshly when she refused, noting this request for sex was made more than a year before Spinney's termination.  Nor does Lane dispute that Austin was always asking Spinney to show her tits and coming up behind her, grabbing her, humping her, and then laughing.  With respect to Spinney's assertion that she reported Austin to Nason and he responded by describing Austin as a good old boy and her contention that Nason laughed when Spinney showed her the lewd Austin picture,  Nason's only testimony is that he cannot remember these interactions with Spinney.  Like Raymond he has not testified under oath that Spinney's description is inaccurate. This latter evidence is not directed at a hostile workforce claim but it is circumstantial evidence of the company's tolerance of the type of conduct that Spinney was complaining about four days prior to her termination.  It is material to the question of pretext as it is evidence of which side the company would take if pressed by Dow.

I do not agree with Lane that Spinney's showing of pretext is so "thin," see Feliciano de la Cruz, 218 F.3d  at 8-9, that she cannot survive summary judgment unless she can generate more substantial evidence of discriminatory animus.  This is not the kind of case that the jury would be

18

left to guess at the reasons behind the pretext.  See Feliciano de la Cruz, 218 F.3d  at 9; Medina-

Munoz , 896 F.2d at 10.  Certainly there are disputed facts and clearly there are credibility issues

to be resolved but a reasonable trier of fact could conclude that the reason for Spinney's

termination was her complaint about Dow's harassment four days earlier.  On this conclusion I

am guided by the portion of the Feliciano de la Cruz opinion denying panel rehearing on the

question of whether the decision was contrary to Reeves v. Sanderson Plumbing Products, Inc.,

530 U.S. 133 (2000):

> Although our prior use of the label, "pretext plus," may have resulted in a
> misunderstanding about the proof required to state a discrimination claim in this
> circuit, we have been careful to explain that the phrase did not mean that the
> plaintiff always must present evidence beyond the proof of pretext in order to
> establish discrimination. In both Woods [v. Friction Materials, Inc., 30 F.3d 255
> (1st Cir. 1994)] and Thomas v. Eastman Kodak Co., we emphatically said that
> this is not the case. See Thomas v. Eastman Kodak Co., 183 F.3d 38, 57 (1st
> Cir.1999) cert. denied, 528 U.S. 1161 (2000) ("Although it uses the label 'plus,'
> the First Circuit's 'pretext plus' standard does not necessarily require the
> introduction of additional evidence beyond that required to show pretext.")
> (internal quotation marks omitted); Woods, 30 F.3d 255, at 260 n.3 ("[S]ome
> cases exist where a prima facie case and the disbelief of a pretext could provide a
> strong enough inference of actual discrimination to permit the fact-finder to find
> for the plaintiff.").
>
> Our precedents are consistent with Reeves, and our application of those
> precedents in the case at hand was consistent with Reeves. We explained that
> Feliciano was not required to show any evidence in addition to her evidence of
> pretext in order to get to the jury. Although we concluded that Feliciano's
> explanations of her job performance problems generated a triable issue of pretext,
> we found her evidence of pretext "thin" (consisting primarily of her own
> explanations of why she was unable to perform her job adequately). That
> evidence did not "shed any light on what El Conquistador's true reason for firing
> her was, let alone show that the reason was discrimination based on Feliciano's
> Puerto Rican origin."

218 F.3d at 10.  Reeves made it clear that " it is permissible for the trier of fact to infer the

ultimate fact of discrimination from the falsity of the employer's explanation."  530 U.S. at 147.

"Proof that the defendant's explanation is unworthy of credence is simply one form of

circumstantial evidence that is probative of intentional discrimination, and it may be quite

persuasive." Id.

> In appropriate circumstances, the trier of fact can reasonably infer from the falsity
> of the explanation that the employer is dissembling to cover up a discriminatory
> purpose. Such an inference is consistent with the general principle of evidence
> law that the factfinder is entitled to consider a party's dishonesty about a material
> fact as "affirmative evidence of guilt." Wright v. West, 505 U.S. 277, 296 (1992);
> see also Wilson v. United States, 162 U.S. 613, 620- 621 (1896); 2 J. Wigmore,
> Evidence § 278(2), p. 133 (J. Chadbourn rev. 1979). Moreover, once the
> employer's justification has been eliminated, discrimination may well be the most
> likely alternative explanation, especially since the employer is in the best position
> to put forth the actual reason for its decision.

Id. at 147-48.  This is a case in which if Spinney were successful in convincing the jury

that her performance problems were not sufficient to justify her sudden termination then

her complaint about harassment is "the most likely alternative explanation."

### *Breach of Contract*

The parties are both terse in addressing Spinney's breach of contract claim.  Lane opines:

> Contracts for employment are deemed to be terminable at will unless the
> contract expressly provides that employment may only be terminated for cause or
> the contract is for a definite duration. Perkins v. City Enterprises I, LLC, 2004
> WL 3196205, *3 (Me.Super.) (citing Taliento v. Portland West Neighborhood
> Planning Council, 1997 ME 194, ¶ 9, 705 A.2d 696, 699, and Burnell v. Town of
> Kingfield, 686 A.2d 1072, 1073 (Me. 1996)); 19 Williston on Contracts § 54:40
> (4th ed.) (same). For purposes of this motion for summary judgment, only,
> Lane assumes that Spinney was offered and accepted a contract for a term of 44
> weeks starting in February of 2005. Such a contract for a definite term, while not
> terminable at will, was terminable for cause. Burnell, 686 A.2d at 1073; Buchanan
> v. Martin Marietta Corp., 494 A.2d 677, 679 (Me. 1985) (employer breached
> contract for a definite term by firing employee without cause). Spinney was
> terminated for cause, namely, her poor job performance typified by the verbal
> reprimands she received, her inability to use a basic tool of her job, her flip
> attitude with a foreman, and her lowest job performance rating of any technician.
> Lane is therefore entitled to summary judgment on Spinney's claim for breach of
> contract.

(Mem. Mot. Summ. J. at 11-12.)

For her part Spinney is even more skeletal, offering no legal authority:

> Count III of Plaintiff's complaint alleges breach of an employment contract for 44 weeks at the rate of $650.00 per week. Defendant summarily argues that it was entitled to fire Ms. Spinney for cause, and that her poor performance provided cause for her termination. This argument fails for the same reasons set forth above. Plaintiff has produced evidence that her job performance was not poor at all; rather, she was complimented for doing a good job. Plaintiff has also produced evidence that Defendant did not in fact fire her for poor performance but because of her complaints about the conduct of Eugene Dow. As such, Defendant's motion for summary judgment on Count III of Plaintiff's complaint should be denied.

(Mem. Opp'n Mot. Summ. J. at 9.)

As Lane admits for purposes of this summary judgment motion that Spinney had a contract and that she could only be terminated for cause, my conclusion that there is a triable issue as to whether or not she was terminated due to her performance issues precludes summary judgment on the breach of contract count.

### *Unpaid Wage Claim*

Section 626 of Maine Revised Statutes title 26 provides: "An employee leaving employment must be paid in full within a reasonable time after demand at the office of the employer where payrolls are kept and wages are paid…"   Spinney's claim under 26 M.R.S. § 626 for unpaid wages is premised on her argument that on the date of termination, when she had worked 30 of the 44 weeks of her contract period "she had earned the full amount owed to her under the terms of the contract."  (Mem. Opp'n Mot. Summ. J. at 10.)  She relies on <u>Madore v. Kennebec Heights Country Club</u>, 2007 ME 92, 926 A.2d 1180.  Madore was hired by the defendant as a golf professional.  The Law Court reasoned:

> [T]he contract language is ambiguous. "[A]n annual base salary of $27,000 to be paid on a weekly basis throughout the year" could mean, as the Club urges, that Madore was to be paid weekly for work over an unspecified period of time. However, this language also lends itself to a second possible interpretation. The

21

payment is specifically described as occurring "on a weekly basis throughout the year." Therefore, it is reasonably possible also to read the contract as contemplating weekly year-round payments for seven months of work as posited by Madore. Because the contract language gives rise to two reasonable and different interpretations, it was not error for the court to admit extrinsic evidence to clarify the parties' intent. See Estate of Barrows, 2006 ME 143, ¶ 23, 913 A.2d 608, 614.

Based in part on the extrinsic evidence admitted at trial, the jury could have interpreted the contract as comporting with Madore's expectations, and awarded him the balance due on a contract that anticipated compensation over the year for the seven months of work that he had completed.

2007 ME 92, ¶¶ 8-9, 926 A.2d at 1183 -84.

Spinney does not contend that there was any ambiguity about the length of her contract term – it is undisputed that she was hired for 44 weeks of work.  It is also undisputed that when Spinney was promoted to a salaried position Leach told Spinney that she would begin in February and be done some time in December.   It is absurd for her to argue that she had fulfilled the terms of this contract by working 30 weeks.  She relies on the portion of the Raymond deposition in which he indicates she would get paid whether or not there was enough work available for her to do or not (and ignoring his indication that if there was not enough QC work then the QC employees would do odds and ends).  There is no support for the proposition that if Spinney unilaterally just stopped going to work after 30 weeks she would still be paid her weekly salary for the remaining 14 weeks.

### *Punitive Damages*

With regards to Lane's request for partial summary judgment on Spinney's claim for punitive damages, damages of this ilk are recoverable under the Maine discrimination acts. Section 4613 of the Maine Human Rights Act provides in part: "A complaining party may recover punitive damages under this subparagraph against a respondent if the complaining party demonstrates that the respondent engaged in a discriminatory practice or discriminatory practices

with malice or with reckless indifference to the rights of an aggrieved individual protected by this Act."  5 M.R.S. § 4613(2)(B)(8)(c).  This standard is applicable to WPA claims as well as MHRA claims.  See Batchelder v. Realty Resources Hospitality, LLC, 2007 ME 17, ¶ 14; 914 A.2d 1116, 1122.  "Section 4613, then, permits an award of punitive damages on proof of conduct found to be less than malicious, i.e., if a defendant acted with reckless indifference."  Id. The Maine common law standard of proof-clear and convincing evidence-is applicable to MHRA and WPA statutory punitive damages claims.  Id. 2007 ME 17, ¶ 22; 914 A.2d at 1124.

I agree with Spinney that if the jury found that Lane terminated Spinney because she complained about the harassment by Dow that this was a purposeful act of discrimination that could meet the reckless indifference standard of Section 4613.

### Conclusion

For the reasons above I recommend that the court dismiss Spinney's tortious interference with contractual advantage count with prejudice because Spinney consents to this dismissal.  I recommend that the court grant Lane's motion for summary judgment on Spinney's unpaid wages claim.  I further recommend that the Court deny summary judgment to Lane Construction Corporation on the remaining three counts – the MHRA and WPA retaliation claims and the breach of contract claim – as well as on the question of whether or not Spinney can recover punitive damages.

### NOTICE

A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. 636(b)(1)(B) for which de novo review by the district court is sought, together with a supporting memorandum, and request for oral argument before the district judge, if any is sought, within ten (10) days of being served with a copy thereof.  A responsive memorandum and any request for oral argument before the district judge shall be filed within ten (10) days after the filing of the objection.

Failure to file a timely objection shall constitute a waiver of the right to *de novo* review by the district court and to appeal the district court's order.

/s/ Margaret J. Kravchuk
U.S. Magistrate Judge

June 4, 2008

24